# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **ELIZABETH A. COMBS**, | ) | |
| Plaintiff, | ) | Civil Action No. 1:07cv00078 |
| | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security**, | ) | BY: PAMELA MEADE SARGENT |
| Defendant. | ) | UNITED STATES MAGISTRATE JUDGE |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

Plaintiff, Elizabeth A. Combs, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Combs's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C.A. § 405(g) and 1383(c)(3) (West 2003 & Supp. 2008). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

Case 1:07-cv-00078-PMS   Document 23   Filed 08/14/08   Page 1 of 26   Pageid#: 705

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Combs filed her applications for DIB and SSI on August 25, 2005, alleging disability as of November 1, 2001, due to a heart condition, leg problems, high blood pressure, chronic obstructive pulmonary disease, ("COPD"), and constant transient ischemic attacks. (Record, ("R."), at 55-57, 62.) The claims were denied initially and upon reconsideration. (R. at 32-44.) Combs then requested a hearing before an administrative law judge, ("ALJ"), who held a hearing on January 31, 2007, at which Combs was represented by counsel. (R. at 13, 45.)

By decision dated March 26, 2007, the ALJ denied Combs's claims. (R. at 16-24.) The ALJ found that Combs met the disability insured status requirements of the Act for DIB purposes through December 31, 2006. (R. at 18.) The ALJ found that Combs had not engaged in substantial gainful activity since her alleged onset date. (R. at 18.) The ALJ also found that the medical evidence established that Combs had a combination of severe impairments, namely osteoarthritis, lower

extremity edema, obesity and abnormal arterial blood gases, but he found that Combs did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments found at 20 C.F.R. Part 404, Subpart, Appendix 1. (R. at 18-19.) The ALJ found that Combs had the residual functional capacity to occasionally lift items weighing up to 30 pounds, frequently lift items weighing up to 15 pounds and to stand and walk no more than four hours in a typical eight-hour workday. (R. at 19.) Thus, the ALJ found that Combs was able to perform her past relevant work as an assembler. (R. at 23.) Alternatively, based on Combs's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that there were jobs that existed in significant numbers in the national and regional economies that Combs could perform. (R. at 23.) Thus, the ALJ concluded that Combs was not disabled under the Act and was not entitled to DIB or SSI benefits. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(f), (g), 416.920(f), (g) (2008).

After the ALJ issued his decision, Combs pursued her administrative appeals, (R. at 11), but the Appeals Council denied her request for review. (R. at 7-10.) Combs then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2008). The case is before this court on Combs's Motion For Summary Judgment filed March 27, 2008, and the Commissioner's Motion For Summary Judgment filed June 3, 2008.

## II. Facts

Combs was born in 1959, which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2008). (R.

at 23.) Combs has a tenth-grade education, which is considered a "limited education." *See* 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3) (2008). (R. at 23.) Combs has past work experience as a customer service worker, a nursing assistant and as an assembler. (R. at 63.)

Combs testified that she last worked as a nursing assistant in November 2001 and that she worked intermittently in that capacity for about 15 years. (R. at 599, 601.) She testified that her work as a nursing assistant required her to lift items weighing up to 160 pounds at a time. (R. at 600.) She also testified that she worked as an attendant at a dry cleaning store where she lifted items weighing up to 50 pounds. (R. at 600.) Combs further testified that she worked as an assembler where she would lift items weighing up to 20 pounds. (R. at 600-01.)

Combs testified that she was unable to work because of chest pains, leg problems, panic attacks, shortness of breath and COPD. (R. at 602-03.) She stated that she could walk about only 10 to 15 feet before having to stop and rest and that she had trouble sleeping because of her breathing problems. (R. at 603.) She testified that her legs became tiresome and sore and began to throb if she stood for more than 15 minutes. (R. at 604.) She stated that she could sit for only 10 minutes at a time without having to stand or move around. (R. at 604.) She testified that she had panic attacks up to two or three times per day and that she had been taking medication for her attacks for the previous six to eight months. (R. at 605-06.) Combs testified that she had trouble concentrating and maintaining attention. (R. at 608.) She also testified that her daughter completed most all household chores and would cook for her. (R. at 609.) She stated that her typical

day involved sitting around and watching television, lying down and walking outside.  (R. at 609.)

Dr. Theron Blickenstaff, M.D., a medical expert, also was present and testified at Combs's hearing.  (R. at 611-12.)  Dr. Blickenstaff testified that the record contained a few objective medical findings, including obesity, arthritis seen in x-rays of the left foot, edema of the lower extremities noted on physical examination and abnormal arterial blood gases.  (R. at 611-12.)  He also noted a normal cardiac catheterization, a normal pulmonary function test, normal chest x-rays and a negative urine drug screen despite a prescription for Xanax.  (R. at 612.)  Dr. Blickenstaff opined that Combs would be limited to occasionally lifting items weighing up to 30 pounds and frequently lifting items weighing up to 15 pounds.  (R. at 612.)  He also opined that Combs would be limited to standing and walking up to four hours out of a typical eight-hour workday.  (R. at 612.)  Dr. Blickenstaff further opined that any other limitations would be based on credibility of symptoms.  (R. at 612.)  He stated that he determined Combs's lifting restrictions by synthesizing the medical evidence as a whole and relying on his cumulative knowledge, judgment and experience in the medical field.  (R. at 617.)

Donna Bardsley, a vocational expert, also was present and testified at Combs's hearing.  (R. at 613-16.)  Bardsley classified Combs's past relevant work as a nursing assistant as medium[1] and semiskilled.  (R. at 613.)  She testified that

_____

[1]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds.  If an individual can perform medium work, she also can perform light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2008).

Combs would have no transferable skills. (R. at 613.) Bardsley was asked to consider a hypothetical individual of the same age, education and work experience as Combs, who was limited by the restrictions testified to by Dr. Blickenstaff. (R. at 613-14.) Bardsley testified that there would be a significant number of jobs available in the national and regional economies for such an individual. (R. at 614.) Bardsley also was asked to consider a hypothetical individual of the same age, education and work experience as Combs, but who was limited as determined in a Physical Residual Functional Capacity Assessment, ("PRFC"), completed by state agency physicians. (R. at 614.) She again testified that there would be a significant number of jobs available in the national and regional economies for such an individual. (R. at 614.) Bardsley also testified that there would be a significant number of jobs available in the national and regional economies for an individual who was limited as set forth in the Psychiatric Review Technique Form, ("PRTF"), completed by state agency psychologists. (R. at 614-15.) She testified, however, that the hypothetical individual would not be able to work based on the limitations in Exhibit 35F, a medical assessment form completed by Norma J. Arnold, M.S.W., or the limitations in a psychological evaluation and mental assessment completed by Ralph Ramsden, Ph.D. (R. at 615.) Bardsley also testified that jobs would not be available if she were to assume that the hypothetical individual had the restrictions testified to by Combs, or if she were to assume the restrictions set forth in the medical assessment dated February 8, 2006, from Dr. Deborah Weddington, M.D. (R. at 616.)

In rendering his decision, the ALJ reviewed records from Dr. Frank M. Johnson, M.D., a state agency physician; Med Express; Johnston Memorial

Hospital; Stephanie Sweeney, F.N.P.; Dr. Larry H. Cox, M.D.; Dr. Deborah Weddington, M.D.; R.J. Milan Jr., Ph.D., a state agency psychologist; Highlands Community Services; Norma J. Arnold, M.S.W.; and Ralph Ramsden, Ph.D., a licensed clinical psychologist. The Appeals Council also reviewed additional evidence from Dr. Weddington.[2]

Combs filed prior applications for disability under the Act in February 1995, February 2002 and December 2002. (Defendant's Memorandum In Support Of His Motion For Summary Judgment, ("Commissioner's Brief"), at 2, n.2.) By decision dated February 17, 2004, an ALJ denied Combs's December 2002 claim for disability, and Combs did not fully pursue her appeal rights. (R. at 70), (Commissioner's Brief at 2, n.2.) Thus, this prior decision is res judicata. The relevant question before this court is whether Combs was disabled at any time between February 18, 2004, and the date of the current ALJ's denial, March 26, 2007. (R. at 16-24.) I note that any medical evidence included in this Memorandum Opinion not directly relevant to this period is included for clarity of the record only.

### A. Medical Evidence Prior to February 18, 2004

The record shows that prior to February 18, 2004, Combs sought treatment, inter alia, for coughing and/or wheezing, COPD, chest pains, reflux problems,

---

[2]Because the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

depression and/or anxiety and leg problems. (R. at 102-404, 416-17, 426-52, 475-80.) During this time period, she was diagnosed by history or otherwise with peripheral edema, (R. at 102, 104), depression and/or anxiety disorder, (R. at 102, 104, 107, 109, 111, 113, 115, 254), arthritis, (R. at 102, 104), COPD, (R. at 102, 104, 161, 198, 314, 347), hypertension, (R. at 103-04, 108, 113, 115, 254, 311, 313), hyperlipidemia, (R. at 103-04, 108), bronchitis, (R. at 103-04, 119), left medial epicondylitis, (R. at 104), ulnar tunnel syndrome, (R. at 104), hypothyroidism, (R. at 104, 108, 110, 113), peripheral vascular disease, (R. at 104), transient ischemic attacks, (R. at 104, 115), gastroesophageal reflux disease, ("GERD"), (R. at 104, 161, 198), peptic ulcer disease, (R. at 112), migraine headaches, (R. at 104), morbid obesity, (R. at 104, 115, 161, 198, 254, 314), right knee pain, (R. at 104), bilateral leg pain, (R. at 107, 109), coronary artery disease, (R. at 112-13, 254), myocardial infarction, (R. at 115, 161), syncope, (R. at 121), muscle spasms, (R. at 121, 438), right thumb sprain, (R. at 136), left arm and thigh muscular pain, (R. at 143), carpal tunnel syndrome, (R. at 157), right thumb tendonitis, (R. at 157), chest pain, (R. at 198, 218, 226, 242-43, 301-02, 311-14, 326, 443, 477), costochondritis, (R. at 229-30), fibromyalgia, (R. at 283, 285), arthralgias, (R. at 301-02), esophagitis, (R. at 311, 313), hypoxemia, (R. at 312-13), toe contusion, (R. at 381, 383), left hip, knee and foot contusions, (R. at 386), tension headaches, (R. at 391-92), right hand, hip and thigh contusions, (R. at 395), pneumonia, (R. at 401), and headaches, (R. at 428, 438-39).

Combs was hospitalized in November 2001, December 2001 and December 2002 for chest pains. (R. at 161-215, 309-46.) It was determined that she suffered a myocardial infarction in November 2001. (R. at 161.) Testing prior to February

Case 1:07-cv-00078-PMS   Document 23   Filed 08/14/08   Page 8 of 26   Pageid#: 712

18, 2004, included normal left foot, hip and knee x-rays in December 1999, (R. at 382, 387), normal right femur, pelvis, lumbar spine, hip, hand and knee x-rays in February 2000, (R. at 396), normal chest x-rays in October 2001, December 2001, April 2002, September 2002, October 2002, December 2002, April 2003, June 2003 and October 2003, (R. at 147, 206, 220, 286, 304, 329-30, 404, 430), a normal cranial computerized tomography scan, ("CT scan"), in November 2001, (R. at 178), a normal echocardiographic examination in November 2001, (R. at 179), normal lumbosacral spine x-rays in August 2002, (R. at 256), a normal cardiac stress test in December 2002, (R. at 108), and normal left knee and lumbosacral spine x-rays in May 2003, (R. at 352-53). In addition, left foot x-rays in December 1999 revealed calcaneal enthesophytes, but were otherwise unremarkable, (R. at 387), and chest x-rays in November 2001 revealed cardiomegaly, (R. at 176). A persantine/cardiolite stress test in December 2002 revealed normal dipyridamole cardiolite myocardial perfusion with evidence of breast soft tissue attenuation, no clear-cut ischemic defects and normal left ventricular wall motion and global function. (R. at 320-22.) An echocardiogram completed in December 2002 revealed low normal left ventricular systolic function and the absence of any significant valvular dysfunction. (R. at 324.)

During this time period, Combs was repeatedly urged to stop smoking, lose weight and start exercising. (R. at 102, 104, 111-12.) On December 19, 2001, and at Combs's request, Dr. Deborah Weddington, M.D., provided Combs an excuse stating that she was unable to work secondary to a recent myocardial infarction and ongoing transient ischemic attacks. (R. at 115, 117-18.) In July 2002, Dr.

9

Weddington advised state agency physician, Dr. Frank M. Johnson, M.D., that Combs was totally disabled from a cardiac standpoint. (R. at 251.)

### B. Medical Evidence Subsequent to February 18, 2004

On March 10, 2004, Combs presented to Med Express[3] for a follow-up regarding her reflux problems, leg and knee pain, insomnia, depression and anxiety. (R. at 415.) An examination revealed an antalgic gait favoring Combs's left leg, edema in both knees, bilateral calf muscle tenderness, increased crepitus on flexion and extension with decreased range of motion secondary to bilateral knee pain. (R. at 415.) Dr. Weddington diagnosed Combs with bilateral leg and knee pain, depression, anxiety disorder, hypertension, bilateral leg edema, coronary artery disease and hypothyroidism. (R. at 415.) She prescribed Xanax, Lortab and Lasix. (R. at 415.) Combs presented to the Johnston Memorial Hospital, ("JMH"), emergency room, ("ER"), on June 16, 2004, with a chief complaint of chest pain. (R. at 463-74.) A physical examination revealed that Combs had decreased air movement, scattered wheezing and pedal edema. (R. at 465.) She was diagnosed with COPD and atypical chest pain and was advised to stop smoking. (R. at 465.) Chest x-rays from JMH dated June 16, 2004, were normal. (R. at 468.)

Combs returned to Med Express on July 16, 2004, complaining of decreased vision in her left eye and for a follow-up regarding her leg problems, chronic pain and anxiety. (R. at 413.) A physical examination revealed edema in both knees. (R. at 413.) Combs was diagnosed with hypertension, coronary artery disease,

---

[3] Dr. Weddington's and/or Med Express's records are mostly illegible.

hypothyroidism, arthritis, depression, anxiety, peripheral edema, decreased visual acuity in her left eye and atypical chest pain.  (R. at 413.)  Combs returned to Med Express on November 16, 2004, with similar complaints, and Dr. Weddington made similar diagnoses.  (R. at 412.)

On December 3, 2004, Combs presented to Stephanie Sweeney, F.N.P., complaining of cough, hypertension, hyperlipidemia and COPD.  (R. at 411.) Sweeney noted scattered rhonchi.  (R. at 411.)  Combs was diagnosed with hypertension, hyperlipidemia, malaise and bronchitis.  (R. at 411.)  She was given samples of Lipitor and Anaplex HD and was prescribed an albuterol inhaler and Bactrim DS.  (R. at 411.)

Combs returned to the JMH ER on December 8, 2004, after becoming dizzy in the shower and falling. (R. at 453-62.) The ER physician noted drug-seeking behavior and reported that, "this is the [patient] that stole Betsy's identity for drugs." (R. at 454-55.) X-rays of Combs's left wrist and left shoulder were normal. (R. at 458.) Combs was diagnosed with a shoulder strain and dizziness. (R. at 455.) She was given Toradol for her pain and Antivert for her dizziness. (R. at 456-57.) Combs also was seen at the JMH ER on January 11, 2005, for left ankle, knee, thigh and hip pain.  (R. at 488-94.) She was diagnosed with a left knee sprain and was prescribed Lortab for pain. (R. at 490-91.) X-rays revealed a normal left ankle, hip and knee.  (R. at 494.)

Combs returned to Med Express on March 21, 2005, for a follow-up appointment.  (R. at 409.)  She was diagnosed with hypertension, coronary artery

disease, COPD, hypothyroidism, depression, anxiety, GERD, arthritis, chronic knee pain, hyperlipidemia and peripheral edema.  (R. at 409.)  She was prescribed Xanax, Lasix, atenolol and Lortab and was provided samples of Ketek, Lipitor and Lortuss DM.  (R. at 409.)  A visit to Med Express on July 28, 2005, revealed similar diagnoses.  (R. at 408.)  Dr. Weddington provided Duraphen Forte samples and prescribed Zanaflex and an albuterol inhaler, in addition to Combs's regular medications.  (R. at 408.)

On August 25, 2005, Combs presented to Stephanie Branham, F.N.P., with complaints of cough, congestion, acid reflux, loss of appetite and difficulty swallowing.  (R. at 407.)  Branham noted increased rhonchi, some tenderness in Combs's upper quadrant area and trace peripheral edema.  (R. at 407.)  She diagnosed bronchitis, COPD, hypertension, difficulty swallowing, hyperlipidemia and GERD.  (R. at 407.)  Branham prescribed Ketek and provided Combs with samples of Anaplex HD, Pneumotussin and Nexium.  (R. at 407.)

On November 28, 2005, Combs reported increased anxiety because of a friend's illness.  (R. at 405.)  Dr. Weddington's examination revealed fatigue, headache, lightheadedness, sore throat, chest pain, palpitations, nausea, heartburn and joint pain and stiffness in both knees.  (R. at 405.)  Combs was diagnosed with hypertension, coronary artery disease, hypothyroidism, hyperlipidemia, depression, anxiety, arthritis, chronic knee pain, edema, migraines, costochondritis and atypical chest pain.  (R. at 405.)  She was prescribed atenolol, Zanaflex, Lortab, Xanax, Phenergan, Lasix and nitroglycerin tablets and was provided samples of Nexium.  (R. at 405.)

12

Combs was hospitalized at JMH from November 30, 2005, to December 2, 2005, as a result of chest pain. (R. at 497-536.) Combs's discharge summary revealed diagnoses of chest pain, ischemia, probable sleep apnea, hypertension, a history of GERD and transient ischemic attacks and a questionable history of myocardial infarction and congestive heart failure. (R. at 497-98.) At discharge, her medications included aspirin, atenolol, Lasix, Protonix, nitroglycerin tablets and Xanax. (R. at 498.) During Combs's hospital stay, testing for cardiac enzymes was negative, her chest pain became 90% resolved with aspirin, she was mostly asymptomatic and she underwent an echocardiogram, which was normal. (R. at 498.) Combs did undergo a cardiolite stress test, which was positive for ischemia. (R. at 498.) She was instructed to undergo a cardiac catheterization after being discharged. (R. at 498.)

While hospitalized at JMH, Combs saw Dr. Larry H. Cox, M.D., for a cardiac consultation. (R. at 500-03.) Dr. Cox noted a long history of chest pain dating back to 2001. (R. at 500.) Dr. Cox noted that Combs stated she had a myocardial infarction in 2001, but Dr. Cox reported that the medical record revealed that Combs did not have a myocardial infarction at that time. (R. at 500.) Rather, he noted, a myocardial infarction was ruled out.[4] (R. at 500.) Dr. Cox noted that Combs's serial electrocardiograms, ("EKGs"), and serial troponins were negative. (R. at 500.) Dr. Cox also reported the results of an adenosine SPECT nuclear study, which revealed marked dyspnea, coughing and some hypoxemia.

---

[4] The court notes that, contrary to Dr. Cox's statement, treatment notes from JMH reveal that in November 2001, Dr. Todd H. Nairn, M.D., diagnosed a myocardial infarction. (R. at 161.) The court further notes that Dr. Cox might have been referencing treatment notes from December 2001, when a myocardial infarction was ruled out at that time. (R. at 198-200.)

(R. at 500.)  Dr. Cox diagnosed chronic chest pain of an undetermined etiology, marked obesity, COPD, probable obstructive sleep apnea, hypertension and chronic leg pain.  (R. at 502.)  He reported that Combs had multiple admissions and multiple ER visits for chest pain and stress tests, but that there was no objective evidence of ischemia at these visits, with the exception of a cardiolite stress test at her then-current visit.  (R. at 502.)  On December 5, 2005, Combs underwent a cardiac catheterization, which revealed normal left ventricular size and function and normal coronary arteries.  (R. at 537-38.)

Dr. Frank M. Johnson, M.D., a state agency physician, completed a PRFC on January 27, 2006.  (R. at 539-45.)  Dr. Johnson found that Combs had the residual functional capacity to occasionally lift and/or carry items weighing up to 50 pounds, frequently lift and/or carry items weighing up to 25 pounds and sit, stand and/or walk with normal breaks for a total of six hours in a typical eight-hour workday.  (R. at 540.)  He also found that Combs had an unlimited ability to push and/or pull.  (R. at 540.)  Dr. Johnson imposed no postural, manipulative, visual, communicative or environmental limitations.  (R. at 541-42.)

R.J. Milan Jr., Ph.D., a state agency psychologist, completed a PRTF on January 28, 2006.  (R. at 547-61.)  Milan found that Combs suffered from an affective disorder, namely situational, mild depression, and an anxiety-related disorder, namely situational, mild anxiety.  (R. at 547, 550, 552.)  Milan found that Combs had no functional limitations and that there was no evidence of significant mental status abnormalities.  (R. at 557, 559.)

On February 8, 2006, Dr. Weddington completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical). (R. at 423-25.) She indicated that Combs could occasionally lift and/or carry items weighing up to 10 pounds and frequently lift and/or carry items weighing up to five pounds. (R. at 423.) She also found that Combs could stand, sit and/or walk for a total of four hours in a typical eight-hour workday. (R. at 423-24.) Further, she found that Combs would never be able to climb, stoop, kneel, balance, crouch and/or crawl, and that her ability to reach and push and/or pull would be affected by her impairment. (R. at 424.) Dr. Weddington determined that Combs's ability to work would be limited by exposure to heights, moving machinery, temperature extremes, chemicals, dust, fumes, humidity and vibration. (R. at 425.) Dr. Weddington concluded that Combs would be absent from work more than two days a month and that Combs was almost nonambulatory due to the combination of her medical conditions. (R. at 425.)

Combs was seen at Med Express on March 30, 2006, with complaints of bad headaches which had persisted for two days. (R. at 564.) An examination revealed tenderness in Combs's right knee and decreased range of motion. (R. at 564.) Dr. Weddington diagnosed hypertension, COPD, hyperlipidemia, coronary artery disease, chronic bronchitis, hypothyroidism, depression, anxiety, diffuse arthritis, chronic knee pain, edema, atypical chest pain, sleep apnea and migraine headaches. (R. at 564.) She prescribed Zanaflex, Lortab, Xanax and Phenergan and provided Combs with samples of Micardis, Nexium and Zocor. (R. at 564.)

Case 1:07-cv-00078-PMS   Document 23   Filed 08/14/08   Page 15 of 26   Pageid#: 719

Combs sought treatment from Highlands Community Services from January 26, 2006, to December 18, 2006. (R. at 579-88.) Over this time period, Combs received counseling from Norma J. Arnold, M.S.W., regarding depression and anxiety. (R. at 579-88.) Combs complained of isolation, tearfulness, hypersomnia, insomnia, lack of appetite and panic attacks. (R. at 578-88.) On August 2, 2006, Combs reported to Arnold that she did not leave her house for a month and a half because of her depression. (R. at 584.) Combs reported that most of her depression and anxiety was related to her physical problems. (R. at 579-88.)

On August 8, 2006, Ralph Ramsden, Ph.D., a licensed clinical psychologist, completed a psychological evaluation of Combs. (R. at 568-74.) Combs reported receiving mental health services from Norma Arnold and that she had seen Arnold on a weekly basis for the past six months. (R. at 570.) She reported that she missed appointments with Arnold because of lack of transportation and because she did not leave her bedroom for one month because of anxiety and depression. (R. at 571.) Ramsden administered the Miller Forensic Assessment of Symptoms Test, ("M-FAST"), a measure of the potential for malingering clinical symptoms. (R. at 572.) Combs received a seven on the M-FAST, which exceeded the cut-off score for potential malingering. (R. at 572.) Ramsden stated that his report "may be somewhat suspect for exaggerating symptoms." (R. at 572.) He also stated that Combs's response style to the Minnesota Multiphasic Personality Inventory-Second Edition, ("MMPI-2"), was indicative of individuals reporting a cry for help or possibly exaggerating symptoms. (R. at 572.) Ramsden concluded that Combs appeared to be in the low average range of intellectual functioning, and he diagnosed a mood disorder and an anxiety disorder, both due to her medical

16

condition. (R. at 573-74.) He assessed Combs's Global Assessment of Functioning, ("GAF"), score at 41.[5] (R. at 574.)

On August 11, 2006, Ramsden also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental). (R. at 575-77.) He indicated that Combs had a fair ability to deal with the public, to use judgment, to interact with supervisors, to maintain attention and concentration, to understand, remember and carry out complex job instructions and to behave in an emotionally stable manner. (R. at 575-76.) Ramsden also indicated that Combs had a poor ability to deal with work stresses, to function independently, to relate predictably in social situations and to demonstrate reliability. (R. at 575-76.) He found that Combs would be absent from work more than two days a month because of her impairments or treatment for such impairments. (R. at 577.)

Combs returned to Med Express on August 14, 2006, for a follow-up appointment and with complaints of "bad spells." (R. at 563.) Dr. Weddington's examination revealed a decreased range of motion and tenderness in Combs's right biceps muscle. (R. at 563.) Dr. Weddington diagnosed right biceps tendonitis, hypertension, hyperlipidemia, coronary artery disease, COPD, chronic bronchitis, hypothyroidism, depression, anxiety, diffuse arthritis, chronic knee pain, edema and migraine headaches. (R. at 563.) She prescribed Lortab, Zanaflex, Xanax,

---

[5]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF score of 41-50 indicates "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning." DSM-IV at 32.

Prevacid and Decadron and provided Combs with samples of Zocor and Micardis. (R. at 563.)

Arnold completed an Assessment Of Ability To Do Work-Related Activities (Mental) on December 21, 2006. (R. at 565-67.) Arnold found that Combs had a fair ability to follow work rules, to relate to co-workers, to function independently, to understand, remember and carry out simple job instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 565-66.) She further found that Combs had a poor ability to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to maintain attention and concentration, to understand, remember and carry out detailed or complex job instructions and to demonstrate reliability. (R. at 565-66.) Arnold concluded that Combs's medical diagnoses "set up an immediate impairment to most any work related activities." (R. at 567.)

On July 16, 2007, Dr. Weddington wrote a letter regarding Combs's mental and physical limitations, which was sent to the Appeals Council by Combs's counsel. (R. at 594.) In Dr. Weddington's letter, she stated that Combs was an unfortunate 47-year-old woman with multiple medical problems. (R. at 594.) She reviewed Combs's medical problems and the findings contained in her February 8, 2006, Medical Assessment Of Ability To Do Work-Related Activities (Physical), and she stated that she found Combs's complaints to be consistent with the physical findings. (R. at 594.)

18

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether the claimant:  1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments.  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano,* 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 26, 2007, the ALJ denied Combs's claims. (R. at 16-24.) The ALJ found that Combs met the disability insured status requirements of the Act for DIB purposes through December 31, 2006. (R. at 18.) The ALJ found that Combs had not engaged in substantial gainful activity since her alleged onset date. (R. at 18.) The ALJ also found that the medical evidence established that Combs had a combination of severe impairments, namely osteoarthritis, lower extremity edema, obesity and abnormal arterial blood gases, but he found that Combs did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments found at 20 C.F.R. Part 404, Subpart, Appendix 1. (R. at 18-19.) The ALJ found that Combs had the residual functional capacity to occasionally lift items weighing up to 30 pounds, frequently lift items weighing up to 15 pounds and to stand and walk no more than four hours in a typical eight-hour workday. (R. at 19.) Thus, the ALJ found that Combs was able to perform her past relevant work as an assembler. (R. at 23.) Alternatively, based on Combs's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that there were jobs that existed in significant numbers in the national and regional economies that Combs could perform. (R. at 23.) Thus, the ALJ concluded that Combs was not disabled under the Act and was not entitled to DIB or SSI benefits. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(f), (g), 416.920(f), (g).

In her brief, Combs argues that the ALJ erred by improperly relying on the medical expert's testimony at the hearing. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-8.) Combs also argues that the ALJ failed to properly weigh the evidence and failed to comply with 20 C.F.R. §§

404.1527 and 416.927.  (Plaintiff's Brief at 8-11.)  Thirdly, Combs argues that the ALJ's decision that she is not under a severe mental impairment is not supported by substantial evidence.  (Plaintiff's Brief at 11-16.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings.  This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence.  *See Hays*, 907 F.2d at 1456.  In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence.  *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein.  *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975).  Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence.  *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979).  While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d) and 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

21

Combs's first argument is that the ALJ erred by improperly relying on the medical expert's testimony at the hearing. (Plaintiff's Brief at 5-8.) I disagree. The United States Court of Appeals for the Fourth Circuit has set forth several principles regarding the treatment of the testimony from a nonexamining, nontreating physician. In *Martin v. Sec'y of Dep't of Health, Educ. & Welfare*, 492 F.2d 905, 908 (4th Cir. 1974), the court indicated that such testimony should be discounted and does not constitute substantial evidence when it is totally contradicted by other evidence in the record. However, the court ruled in *Kyle v. Cohen*, 449 F.2d 489, 492-93 (4th Cir. 1971), that the testimony of a nonexamining, nontreating physician can be used and relied upon if it is consistent with the record. Based on my review of the record, I find that substantial evidence supports the ALJ's residual functional capacity finding, because the ALJ's finding is consistent with the record as a whole.

As noted by the ALJ, the restrictions placed upon Combs by Dr. Weddington and Arnold are not supported by the objective medical evidence and the record as a whole. (R. at 21-22.) Instead, these restrictions appear to be based on Combs's subjective complaints. (R. at 21-22.) It is well-settled that subjective allegations alone will not suffice to establish disability. There also must be "medical signs and laboratory findings" to show a medical impairment that could reasonably be expected to produce the alleged symptoms. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a) (2008). I further note that while some of these medical sources opined that Combs was disabled, it is well-settled that the determination of disability is reserved solely to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e) (2008).

22

Combs also argues that the ALJ failed to properly weigh the evidence and failed to comply with 20 C.F.R. §§ 404.1527 and 416.927. (Plaintiff's Brief at 8-11.) Combs's argument centers on the ALJ's use of the medical expert's opinion, discussed *supra*, and the ALJ's decision to discredit the opinions of Dr. Weddington, Arnold and Ramsden. (Plaintiff's Brief at 10-11.) I find that the ALJ's opinion contains an adequate analysis of the opinion evidence and his rationale for accepting or discrediting evidence. The ALJ noted that he found "the testimony of the medical expert to be credible and persuasive," and he assigned his testimony "great weight." (R. at 19.) As aforementioned, the ALJ's decision to afford great weight to a nontreating, nonexamining source can be relied on if it is consistent with the record as a whole.

The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2008). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).[6] In fact,

---

[6] *Hunter* was superseded by 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), which state in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

"if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. In this case, the ALJ's decision to reject the opinions of Dr. Weddington, Arnold and Ramsden is supported by substantial evidence.

The record reveals many subjective allegations, but little objective evidence of a disability. While Dr. Weddington placed several restrictions on Combs in her Medical Assessment Of Ability To Do Work-Related Activities (Physical), these restrictions are not supported by Dr. Weddington's own treatment of Combs. (R. at 405-25, 563-64.) During the time period in question, Combs was seen only every four months, she received treatment only in the form of medications, which Dr. Weddington prescribed, and she was never referred to a specialist. (R. at 405-25, 563-64.) Dr. Weddington's diagnoses, in large part, are simply based on the subjective allegations of Combs. (R. at 405-25, 563-64.) Additionally, many of Dr. Weddington's restrictions are based on Combs's report that she had a myocardial infarction in 2001. (R. at 405-25, 563-64.) However, on December 5, 2005, a cardiac catheterization, ordered by Dr. Cox, revealed normal left ventricular size and function and normal coronary arteries. (R. at 537-38.) Additionally, Dr. Johnson's PRFC indicated that Combs had the residual functional capacity to perform medium work with no postural, manipulative, visual, communicative or environmental limitations. (R. at 540-42.)

---

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2008).

With respect to Dr. Weddington's diagnoses of anxiety and depression, these diagnoses were based on worries about Combs's family, finances and health, or as the result of a friend's health, (R. at 405), or a family member's health, (R. at 414). Dr. Weddington's treatment notes do not provide any indication of a severe mental impairment. Also, while Combs visited the ER on multiple occasions due to sprains and chest pain, she never made complaints of any severe mental impairment. Thus, the ALJ's determination that Dr. Weddington's assessment was too restrictive and inconsistent with the remaining documentary evidence is supported by the record as a whole.

Likewise, the ALJ's determination that Ramsden's assessment was too restrictive and inconsistent with the remaining documentary evidence is supported by the lack of objective evidence to indicate that Combs suffers from a severe mental impairment. Combs's M-FAST score revealed a potential for malingering, and Combs's response style to the MMPI-2 was indicative of possible exaggeration of symptoms. (R. at 572.) While Ramsden placed various mental restrictions on Combs, he also indicated that his report "may be somewhat suspect for exaggerating symptoms." (R. at 572.) The ALJ properly relied on Milan's determination that Combs had no functional limitations and that there was no evidence of significant mental status abnormalities. (R. at 557, 559.) Similarly, the ALJ's determination that Arnold's assessment was based solely on subjective complaints is consistent with the record and supported by substantial evidence. (R. at 22.) As the ALJ noted, treatment records from Arnold indicate that Combs had only mild depression and that she made progress throughout her treatment. (R. at 22.)

Thirdly, Combs argues that the ALJ's finding that she does not have a severe mental impairment is not supported by substantial evidence. (Plaintiff's Brief at 11-16.) As aforementioned, the ALJ properly relied on the opinion of Milan and provided adequate rationale for his decision to reject Dr. Weddington's and Arnold's mental restrictions. As the ALJ points out, it is probative that Combs did not even allege a mental impairment in her application for disability. (R. at 22.)

## IV. Conclusion

For the foregoing reasons, Combs's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted, and the Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED: This 14th day of August 2008.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

26